IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Case No. 1:12cr192 |
| QUINCY L. ALEXANDER, | ) ) | |
| Defendant. | ) ) ) | Hon. Anthony J. Trenga |

## DEFENDANT'S POSITION ON SENTENCING FACTORS

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the United States Sentencing Guidelines ("Guidelines"), and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, the Defendant, Quincy Alexander, through counsel, states he has received and reviewed the Pre-Sentence Investigation Report ("PSR") prepared in this case.

On July 18, 2012, Mr. Alexander entered a guilty plea to a one count indictment charging him with being a Felon in Possession of a Firearm in violation of Title 18 U.S.C. §922 (g) (1). According to the PSR, Mr. Alexander's base offense level is twenty (20) as calculated under sections 2X1.1(a)/2B3.1(a) of the Sentencing Guidelines.

The PSR also attributes two (2) additional enhancements, which increase Mr. Alexander's offense level. The PSR maintains that Mr. Alexander should receive seven (7) additional points added to his offense level under 2B3.1(b)(2)(A) of the Guidelines, and an additional four (4) point increase under 2B3.1(b)(3)(B). These additions would increase Mr.

1

Alexander's offense level to thirty one (31). Pursuant to the Plea Agreement Mr. Alexander receives a three (3) point reduction for his acceptance of responsibility.

According to the PSR's guideline calculations Mr. Alexander's offense level is twenty-eight (28). The PSR also calculates his criminal history to be a category V. This calculation correlates to a guideline range of 130 to 162 months. However this range is restricted to 120 months as the statutory maximum for the charged offense. Finally, pursuant to his plea agreement, the Government has agreed to not seek a sentence exceeding forty- eight (48) months.

Mr. Alexander objects to the calculation submitted by the PSR on three grounds as follows: the PSR's use of 2X1.1(a)/2B3.1(a) guideline instead 2K2.1(c)(1)(A) to calculate his offense level; the erroneous addition of the aforementioned enhancements under 2B3.1(b)(2)(A) and 2B3.1(b)(3)(B); and while his criminal history category is correctly calculated, Mr. Alexander asserts that it overstates his criminal background and requires a downward departure from the calculation.

For the reasons set forth below Mr. Alexander submits that his guidelines are appropriately calculated under section 2K2.1(c)(1)(A), with no applicable enhancements and that a downward departure from criminal history category V to category IV is appropriate. Accordingly, Mr. Alexander submits that a guideline range of twenty-one (21) to twenty-seven (27) months is sufficient to meet the aims of sentencing.

**Guideline Calculations**

Mr. Alexander objects to the PSR's calculations of his sentence under the Robbery 2X1.1(a)/2B3.1(a) section of the guidelines. He submits that he has pled guilty to being a felon in possession of a firearm and stipulated to a statement of facts that only encompasses that

proscribed behavior. Accordingly Mr. Alexander contends that his sentence should be properly calculated under section 2K2.1(c)(1)(A).

The PSR's founds its calculations of Mr. Alexander's guidelines on the original complaint and affidavit leading to the issuance of an arrest warrant for Mr. Alexander. Its contents are thoroughly set out in the PSR but will be referenced below.

U.S.S.G § 1B.3(a)(2) requires that for certain offenses the base offense level should reflect all acts and omissions that are part of the same course of conduct or common scheme or plan as the offense at conviction, or more succinctly stated "relevant conduct".  In determining what relevant conduct is, Courts are not required to disregard conduct that is not charged or that the defendant has been acquitted of. U.S. v. Grubbs, 585 F. 3d 793, 803-04 (4th Cir. 2009) (uncharged conduct); U.S. v. Watts, 519 U.S. 14, 155-156 (1997) (acquitted conduct). Furthermore the Court may even rely on evidence that may not have been admissible at trial and can specifically consider hearsay. U.S. v. Wilson, 896 F.2d 856, 858 (4th Cir. 1990). It appears that the only limiting principles placed upon the Court is that it use only evidence that is relevant and reliable. Ibid.

Mr. Alexander submits that the PSR's use of the Government's affidavit in order to justify its calculations under 2X1.1(a)/2B3.1(a) is in error. This error, he submits, is not owing to the relevance of the material if true, but because it suffers from a lack of reliability in its sourcing

According to affidavit's allegations unindicted co-conspirator (1) (UCC-1) was a distributor of marijuana on behalf of Mr. Alexandria. During the course of his alleged association with Mr. Alexander, UCC-1 was robbed of money by an individual N.C. Mr. Alexander is then alleged to have devised a plan to retrieve the stolen money and provided the subject firearm in furtherance of the plan

3

According to the alleged plan attributed to Mr. Alexander, another unindicted co-conspirator (UCC-2), was allegedly directed by Mr. Alexander to lure N.C. from his home whereby UCC-1 would confront him and retrieve the previously stolen money. Upon UCC-1's confrontation of N.C., a struggle ensued, whereby the firearm was discharged, striking N.C. in his hand and leg. Shortly after the discharge of the firearm, UCC-1 was apprehended and the firearm recovered. UCC-1 was subsequently convicted of Malicious Wounding and sentenced to a term of imprisonment.

Mr. Alexander concedes that the foregoing allegations, if true would be relevant conduct to be considered by the Court in calculating his guidelines. However, Mr. Alexander contends that the sources for which these allegations are founded are not reliable ones and therefore should not be considered by the Court.

In UCC-1's first police interview after apprehension, he admits his involvement in confronting N.C. to recover money previously stolen and that due to his actions N.C. was wounded from the discharge of the firearm. UCC-1 never implicates Mr. Alexander in his first interview and explicitly states that Mr. Alexander was not involved in the transferring of the firearm to his possession nor was he involved in the planning of the attempted robbery. Moreover, UCC-1 continued to maintain this version of events through at least one if not more successive interviews for approximately a year before changing his story.

In changing his version of events, UCC-1, after the passage of approximately a year, and presumably only after offers of consideration for his own matters, begins to concoct a new version of events that now implicates Mr. Alexander. In his latest version of events, UCC-1, places Mr. Alexander as the mastermind of the robbery scheme and the source from where he received the firearm in question.

UCC1-1 current version places himself and UCC-2 at Mr. Alexander's residence on the September 17, 2010, where Mr. Alexander devises a robbery plan. After discussion of the logistics of the contemplated robbery is laid out to UCC-1 and UCC-2, Mr. Alexander is said to proceed into his residence and emerge minutes later with a firearm. Mr. Alexander is then said to hand the firearm to UCC-1 and set the plan in motion.

The PSR also presumably relies on statements made by UCC-2. When first interviewed by law enforcement shortly after the robbery and wounding of N.C., UCC-2 admitted to luring N.C. from his house but denied knowing UCC-1's intent to rob N.C. UCC-2 also failed to implicate Mr. Alexander in the planning or transferring possession of the firearm to UCC-1. UCC-2 maintained this version of events for approximately a year through at least one if not more successive interviews. It was only after the expiration of that time and presumably lingering under prosecutorial duress for his participation, that he amends his story to name Mr. Alexander as someone present during the transfer of the firearm. UCC-2's first amendment to his story is that an unidentified party arrives in a jeep and transfers the firearm to N.C. UCC-2 at this time states that Mr. Alexander is present but is not close enough to audibly hear any of Mr. Alexander's conversation with UCC-1.

UCC-2's amended version of events comes approximately a year later, and differs substantially from that of UCC-1. Particularly, UCC-2 contradicts UCC-1 in how the firearm was ultimately transferred to UCC1. Furthermore, while in UCC-1's final version of events, UCC-2 was an active participant in the planning of the robbery scheme, going so far as to say that UCC-2 was directed by Mr. Alexander to lure N.C. out from within his home, UCC-2 unequivocally states that he was not able to hear the planning of the robbery between Mr.

5

Alexander and UCC-1. Finally, it is important to note that UCC-2 admitted to heavy narcotic use before and during the time period that the alleged events in question occurred.

Mr. Alexander contends that the consideration of statements of UCC-1 and UCC-2 would be in error because of their unreliability. The fact that both UCC-1 and UCC-2 initial and subsequent statements spanning the course of approximately a year inculpated themselves in the robbery scheme but exculpated Mr. Alexander is a matter of import that should be taken into consideration by the Court in determining their reliability. The Court should also consider what if any influence that prosecutorial duress may have affected their dynamic stories and also the conflicting nature of substantive portions of their accounts.

Finally, Mr. Alexander contends that these allegations have been presented to other competent tribunals; he has only ever been charged with, and pled guilty to the offense of a felon being in possession of a firearm. Due to the foregoing Mr. Alexander believes that a correct computation of his sentencing guidelines should proceed under section 2K2.1(c)(1)(A). Such a calculation would result in a base level offense of fourteen (14) with a two (2) point reduction for acceptance of responsibility, resulting in an adjusted base offense level of eleven (12).

**CRIMINAL HISTORY CATEGORY**

The PSR calculation of Mr. Alexander's criminal history places him in a category V. Mr. Alexander concedes that PSR's calculation of his criminal history is technically computed correctly pursuant to the dictates of the Sentencing Guideline instructions, however, he does contend that this calculation overstates his criminal history. Accordingly, Mr. Alexander submits that a downward departure is warranted in calculating his criminal history, and that the correct calculation should place him in a category IV.

Specifically, Mr. Alexander asks the Court to consider the exacerbating effect his February 25, 2004 misdemeanor conviction and the two (2) point enhancement for being under a criminal sentence has on his criminal history category. Mr. Alexander's 2004 conviction stemmed from his operating a motor vehicle while his license was suspended or revoked. It is important to note that according to the PSR, this conviction constituted Mr. Alexander's first as an adult. He was sentenced to a thirty (30) day period of incarceration that resulted in the addition of one criminal history point. The enhancement proceeds from a suspended sentence also stemming from a driving while his license was suspended or revoked.

Mr. Alexander contends that but for a harsh sentence for a first traffic offense as well as the enhancement for being on a suspended sentence for a traffic offense, his criminal history category would have been properly calculated in the IV category. It is Mr. Alexander's contention that traffic offenses while properly included, vastly overstate the seriousness of his criminal history and would ask that the Court downwardly depart from it.

## **APPLICATION OF U.S.C. §3553(a) Factors**

In *Kimbrough v. United States*, 128 S. Ct. 558 (2007), the Supreme Court held that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory factors detailed in 18 U.S.C. §3553(a). Courts must consider the recommended guideline range as one of seven co-equal statutory sentencing factors referenced in 18 U.S.C. §3553(a). *United States v. Booker*, 543 U.S. 220, 259-60 (2005). The factors to be considered are: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the

seriousness of the offense, to promote respect for the law, to provide for just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a). After considering these factors, the Court has discretion to differ with the U.S.S.G.'s custody range, *See Rita v. United States*, 127 S. Ct. 2456 (2007). Furthermore, the sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of §3553(a).

### A. The Nature and Circumstances of the Offense

Mr. Alexander has accepted responsibility for being a felon in possession of a firearm. At the time, Mr. Alexander was approached by UCC-1 who inquired of whether he knew anyone who wanted to sell a firearm. Mr. Alexander, at the time also knew of an individual looking to sell the particular firearm in question here. Mr. Alexander arranged for the firearm to be delivered to his residence, where he along with UCC-1 and UCC-2 awaited for the other party to arrive. The other party arrived in a jeep, the one identified by UCC-2 in his statements, and delivered the firearm to UCC-1. Mr. Alexander was present at the transfer, and came within close proximity of the gun, thus he understands he may be seen to constructively possess the firearm.

Mr. Alexander however, strenuously denies ever masterminding a plan or ever being aware of UCC-1's intentions to rob N.C. UCC's statements to law enforcement while implicating himself tend to exonerate Mr. Alexander. Particularly that he never heard Mr. Alexander in his alleged planning of a robbery.

While Mr. Alexander's cannot and will not admit that he was ever involved in UCC-1's scheme, he does now understand the societal interest in preventing individuals similarly situated

as himself in possessing firearms. And due to his involvement in the transfer of a firearm while being a prohibited person, he accepts that he must now accept the punishment of the Court.

> **B. The History and Characteristics of the Defendant, the Need to Provide the Defendant with Needed Educational Training, and the Need to Provide Restitution.**

Mr. Alexander is an intelligent, sociable, and overall likable individual. He is currently thirty (30) years old and was living with his mother, younger brother, wife and two children at the time of this offense. In the intervening period between the date of this offense and his arrest, many things in his life have changed.

At the time of his arrest, Mr. Alexander and his wife Hindreen Ali mutually separated but continued to co-parent their two beautiful children. Since their separation, Ms. Ali characterizes Mr. Alexander as a very good father who has done everything for their kids. Also at the time of his arrest, Mr. Alexander had just learned that he was to become the proud father of a baby girl with his new girlfriend. The story of love, affection, and endearment between Mr. Alexander and his children stand in stark contrast to his life as an adolescent.

Mr. Alexander was born on December 15, 1981 in Birmingham, Alabama to parents he has never known. He was adopted by Phyliss Alexander who at the time was an active duty member of U.S. military service. Due to his mom's military career, Mr. Alexander remembers always being uprooted from time to time and settling in new communities where he would always have to begin anew. In fact Mr. Alexander recalls that some of his most stable periods in his adolescence occurred when he remained in the care of his grandparents during his mother's leave abroad for military service.

9

In or about 1992, the defendant recalls the family moving Burbank, CA just outside the city of Los Angeles. The defendant sums up life as a black youth growing up in the Los Angeles as one where you had to choose. However, it wasn't a choice of friends, sport, or activity that you would spend your childhood pursuing; it was a choice between life and death. As young boy in a gang infested area, choosing to belong to a gang was not a lifestyle; it was a life sustaining measure. While in California, Mr. Alexander was committed to their youth facilities for the balance of his teenage years, being released at approximately the age of twenty-one (21) years old. Mr. Alexander describes this time period of incarceration as the time when he became strongly involved in gang life and activity as a way to survive in California's gang ridden youth detention system.

Prior to his release, Mr. Alexander's family moved to Burke, Virginia, and upon his release he joined them there. Admittedly, Mr. Alexander has been open with the fact that his gang participation followed him here to Virginia. Eventually, his life's choices caught up with him and resulted in a felony conviction for gang recruitment. He was sentenced to approximately three (3) years of active incarceration. It is during this period, that he says he underwent a change for the better.

While in prison, he married Ms. Hindreen Ali, who stayed supportive of Mr. Alexander throughout the duration of his imprisonment. Upon his release, Mr. Alexander vowed to throw off his gang affiliations and start a new life. Shortly after being released Mr. Alexander and Ms. Ali received the news of the pendency of the first child being born. Shortly after his first child's birth their second one was on the way. The birth of his children changed Mr. Alexander, and it is reflected in his record since release. His record up to the date of this offense showed no convictions save for traffic offenses, to include of note, no violations of his probation.

Mr. Alexander upon becoming a father and shedding past associations, attempted to try and support his family through gainful employment. He has been moderately successful in the past in maintaining lawful employment, but his criminal record sometimes has been a hindrance. However, prior to his arrest, the defendant did have intermittent employment with Realtor Jim Sandige that was corroborated in the PSR.

### C. The Kinds of Sentences Available

In this case the Court must impose a sentence of imprisonment. The available options available to this Court rests upon which guidelines the Court decides to calculate the sentence under.

### D. The Need for the Sentence to Reflect the Basic Aims of Sentencing: "just punishment," deterrence, and rehabilitation.

Mr. Alexander is thirty (30) years old and is potentially facing the longest period of incarceration of his life. He has accepted responsibility for being in constructive possession of a firearm and is remorseful for his actions. However, Mr. Alexander has always maintained, and as the aforementioned discussion highlights, Mr. Alexander is claimed to be involved in a conspiracy that the evidence fails to corroborate. He readily admits as acting as a conduit between UCC-1 and the unidentified party in the jeep, to place them in contact with one another, and to arrange for the transfer of the firearm as corroborated by UCC-2. He further admits to being present outside his residence in close proximity to the firearm when the transfer to UCC-1 occurred, which could place him in constructive possession of the firearm. This too was corroborated by UCC-2. And lastly, Mr. Alexander disclaims any knowledge of UCC-1's contemplated robbery scheme, as corroborated by UCC-2.

Mr. Alexander does however understand the need for the Court to impose punishment upon him for his conduct that violated the law. Mr. Alexander has long ago accepted this notion, and while in custody has made good use of his time.

For the great balance of his life, Mr. Alexander has had a drug dependency. His drug usage dates back to the age of twelve (12) years old. It is an addiction that has gotten progressively worse over the years and has even led to a felony conviction for marijuana. Mr. Alexander has never sought to address the strong-hold that addiction has played in his life until now. Since being taken into federal custody, Mr. Alexander has been enrolled in substance abuse classes and is scheduled for completion in January of 2013. Even in contemplating completion of this class, Mr. Alexander has expressed the sentiments that this will be a lifelong journey and that he desires to continue in whatever treatment options are available.

The government's position on sentencing is that Mr. Alexander should receive no more than forty-eight (48) months as per the plea agreement. This is in part due to their perceived theories of Mr. Alexander's involvement in a larger robbery conspiracy as well as the guidelines that would flow from that. Under the government's theory, Mr. Alexander's guidelines would be restricted to the 120 months maximum for the charged offense. Should the Court accept the government's theory of wider participation, over Mr. Alexander's strenuous objections, we would agree that a period of no more than forty-eight (48) would be appropriate to achieve the Court's aims of sentencing. However, as noted above Mr. Alexander urges the Court to reject the government's "relevant conduct" as unreliable and return his guideline calculations to section 2K2.1(c)(1)(A). Under those guidelines, Mr. Alexander would have a base offense level, given acceptance of responsibility, of twelve (12). Also if the Court grants a downward departure in his criminal history category to IV, his guidelines range then becomes 21 to 27 months. Mr.

Alexander believes that a sentence within this range would be of the character that reflect a just punishment, deter the defendant as well as society from engaging in this type of behavior, and that his time incarcerated with give him the space to continue with his rehabilitation.

## CONCLUSION

For the reasons stated above, Mr. Alexander respectfully requests that this Court impose a sentence within his proper sentencing guidelines between 21 to 27 months. It is Mr. Alexander's position that this sentence is sufficient to accomplish the objectives of sentencing as detailed in 18 U.S.C. §3553(a). Mr. Alexander also requests that the Court impose no fine or costs of confinement or supervision given his limited financial resources and inability to pay.

Quincy L. Alexander

By Counsel

COUNSEL:
By:_____/s/_____
Donald E. Harris
2815 Duke St.
Alexandria, VA 22314
(703) 225 - 3366
(703) 225-3333 (Fax)
dharris@simmsharris.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2012 I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Zachary Terwilliger, Esq.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314

(703) 299-3700

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing will be delivered to Chambers within one business day of the electronic filing. A courtesy copy also will be delivered to the assigned U.S. Probation Officer, Third Floor, 401 Courthouse Square, Alexandria, Virginia, 22314.

By:_____/s/_____
Donald E. Harris
2815 Duke St.
Alexandria, VA 22314
(703) 225 - 3366
(703) 225-3333 (Fax)
dharris@simmsharris.com